CAROL A. SOBEL SBN 84483
LAW OFFICE OF CAROL A. SOBEL
429 Santa Monica Boulevard, Suite 550
Santa Monica, California 90401
t. 310 393-3055 f. 310 451-3858
e. carolsobel@aol.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| Katherine Knox-Davies, Jesse Dotson, Matt Ward, Mario Brito and James Lafferty, as individuals,<br><br>Plaintiffs,<br><br>v.<br><br>City of Los Angeles, a municipal entity; Mayor Antonio Villaraigosa, Chief Charlie Beck, in their official capacities,<br><br>Defendants. | CASE NO.: CV11-09792 PA(FFMx)<br><br>VERIFIED COMPLAINT: CIVIL RIGHTS VIOLATIONS<br><br>42 U.S.C. §1983<br><br>FIRST AMENDMENT<br><br>FOURTEENTH AMENDMENT<br><br>CALIFORNIA CONSTITUTION: ARTICLE I, Sec. 2, 7, 13 |

Plaintiffs file this action for injunctive and declaratory relief to redress an unconstitutional deprivation of access to a traditional public forum, the south lawn of City Hall, for First Amendment activity. Plaintiffs also seek a determination that the defendants have engaged in arbitrary and capricious action in violation of the First and Fourteenth Amendments by first approving the Occupy presence for 56 days before suddenly revoking permission through the unilateral action of defendant Villaraigosa.

**JURISDICTION AND VENUE**

1. Jurisdiction is proper in this Court in that the plaintiffs bring this action pursuant to the First and Fourteenth Amendments to the United States Constitution,


1. as made applicable to state and municipal entities through 42 U.S.C. § 1983. The Court has jurisdiction to issue injunctive relief to redress a violation of a federal constitutional right pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). The court has pendent jurisdiction to consider the state constitutional claims, which are analogous to the federal constitutional claims. Jurisdiction to issue declaratory relief is pursuant to 28 U.S.C. §2201, permitting a declaration of the rights of any interested party in a case of actual controversy.

2. Venue is proper in the Central District of California as the acts of defendants giving rise to this action occurred in the City of Los Angeles, which is within the geographic area of the Central District - Western Division.

## PARTIES

**Plaintiffs:**

3. Plaintiff Mario Brito is a participant in Occupy LA. From the outset of the Occupy LA movement, Mr. Brito has been one of several individuals participating in meetings with the defendant City and command staff from the Los Angeles Police Department concerning Occupy LA. He desires to continue to engage in expressive activity on the south lawn of City Hall as part of the Occupy movement. He bring this action in his individual capacity.

4. Plaintiff Katherine Knox-Davies is a participant in Occupy LA. She works as an in-home care provider for her mother, who is disabled. She has participated in Occupy since discussions began at Pershing Park in late September, and has continued to participate at the location of City Hall's south lawn. Ms. Knox-Davies wants to continue to engage in expressive activity on the south lawn of City Hall as part of the Occupy movement.

5. Plaintiff Jesse Dotson is a participant in Occupy LA. He works as a pre-school teacher. He has participated in Occupy since discussions began at Pershing Park in late September, and has continued to participate at the location of City Hall's south lawn. Mr. Dotson wants to continue to engage in expressive activity on the

south lawn of City Hall as part of the Occupy movement.

6. Plaintiff Matt Ward is a participant in Occupy LA. He has been involved since the beginning and has continued to participate at the location of City Hall's south lawn. Mr. Ward wants to continue to engage in expressive activity on the south lawn of City Hall as part of the Occupy movement.

7. James Lafferty is the Executive Director of the National Lawyers Guild, Los Angeles chapter. Mr. Lafferty has been involved with the Occupy Los Angeles movement since its inception. He has participated frequently in the General Assembly meetings at night at Occupy LA and has participated in the teach-ins sponsored at Occupy LA. On multiple occasions, he has addressed the General Assembly on a variety of issues on issues of civil and economic justice. He wants to continue to engage in expressive activity on the south lawn of City Hall as part of the Occupy movement.

**Defendants:**

8. Defendant City of Los Angeles is a municipal entity with the capacity to sue and be sued.

9. Defendant Antonio Villaraigosa is the mayor of defendant City of Los Angeles. Defendant Villaraigosa is the public official who unilaterally revoked permission for Occupy LA to engage in expressive activity on the south lawn of City Hall. Defendant Villaraigosa's authority to take such action is defined by the Los Angeles City Charter and the Los Angeles City Administrative Code. He is sued in his official capacity only.

10. Defendant Charlie Beck is the Chief of the Los Angeles Police Department. He is a public official charged with enforcing the Mayor's order to remove Occupy LA participants from the south lawn of City Hall. He is sued in his official capacity only.

# FACTUAL ALLEGATIONS

**OCCUPY LA:**

11. In mid-September in New York City, Occupy Wall Street ("OWS") began, giving voice to the concerns of the 99% of the population who are of moderate, low income or no income. The events in New York city have sparked a movement that reaches across the country and, indeed, around the world to advocate for holding accountable elected officials and to counter the increasing influence of corporations on public decisions.

12. One outgrowth of OWS was Occupy Los Angeles ("OLA"). In or about late September, a group of individuals started meeting at Pershing Park in downtown Los Angeles. Formed into a General Assembly ("GA"), the group formulated plans to communicate the message of OWS - to challenge corporate corruption and demand accountability of elected officials - by "occupying" the south lawn of Los Angeles City Hall.

13. The GA selected plaintiff Brito to act as a liaison with the City regarding the plans to march to City Hall from Pershing Park and begin the expressive action that became known as Occupy LA. Throughout late September, Brito and others attended City Council meetings seeking support for OLA, met with police and other City employees regarding OLA's plans and, when Capt. Chamberlain threatened to have everyone arrested if they erected tents and slept on the south lawn or the sidewalk, informed the GA of these developments.

14. On October 1, 2011, plaintiffs Brito and Lafferty met with Commander Sherman of the LAPD. By the end of the meeting, the LAPD informed the representatives of OLA that the group could have tents on the lawn during the day, but needed to move the tents to the sidewalk at night. OLA complied with these orders even as the OLA liaisons continued to meet with the LAPD and General Services Department Office of Public Safety ("GSD-OPS").

15. Just a few days later, on or about October 5, 2011, Steve Nutter, the Mayor's special assistant for labor relations, met with plaintiffs Brito and Lafferty and informed them that, at the behest of the Mayor, Nutter had met with LAPD and GSD-OPS representatives. Mr. Nutter informed plaintiffs that they could maintain the tents on the lawn at night and that Los Angeles Municipal Code §63.44 would not be enforced.

16. Los Angeles Municipal Code §63.44 contains two provisions pertinent here. Section 63.44B.14(a) provides that "[n]o person shall entire, remain, stay or loiter in any park between the hours of 10:30 p.m. and 5:00 a.m. of the following day." Section 63.44D.4 provides that "no person shall camp or lodge in any park, except in locations designated for such purposes." Occupy LA is not the only instance in which the City has suspended application of §63.44's "anti-camping" prohibition. But each decision is made based on a standardless scheme, permitting the whim of the police to be the sole determinant of when the ordinance is applied and when it is ignored. Just a few weeks ago, hundreds of people camped out for a week at Exposition Park just to get a wrist band to then get in line, again, to be eligible for free medical services. An estimated 500 fans of the vampire movies, Twilight, camped out on the sidewalks of Westwood Village for several days to be first in line for the midnight showing of the first Twilight sequel. This month, more than 1,000 people camped out to glimpse the stars at the premiere of the most recent Twilight film, forcing the closure of Chick Hearn Drive. Even on Skid Row, just blocks from City Hall and around the corner from the Central LAPD station, each year families camp on the sidewalk for days to get free school supplies distributed by the Fred Jordan Mission. Each of these "camping" events is highly publicized in the media, takes place in highly-trafficked areass and could not possibly be an unnoticed and unintentional exception to enforcement of the municipal code.

17. The OLA "assembly" on the south lawn of City Hall did not require a permit pursuant to Los Angeles Municipal Code §103.111. This section was adopted

5

1  following a successful challenge to the City's prior permitting scheme at the time of
2  the Democratic National Convention in Los Angeles in 2000. An "assembly" is
3  defined as "any stationary formation, assembly, or gathering for the purpose of
4  Expressive Activity upon any public street, sidewalk, alley, <u>or other public place</u>,
5  which does not comply with normal or usual traffic regulations or controls." *Id.* The
6  authority to grant or deny permission for activities covered by LAMC §103.111 rests
7  with the Board of Police Commissioners, not the Mayor's office.

**THE CITY COUNCIL RESOLUTION:**

9      18. For more than a month, OLA was permitted to maintain tents on the lawn
10 as part of its expressive activity. OLA responded to all requests by the City to
11 conform their activities on health and safety issues and were repeatedly advised that
12 the City's concerns had been satisfied. During that time, the City Council passed a
13 resolution, expressly approving support for the ongoing First Amendment activity of
14 OLA. See Exhibit A.

15     19. One of the first paragraphs of the Council resolution stated that: "... on
16 Saturday, October 1st, 2011, "Occupy Los Angeles" started a peaceful protest on the
17 Lawn of Los Angeles City Hall that continues through this day [October , 2011]. At
18 that time, approximately a week had passed since OLA had been permitted to keep
19 tents on City Hall lawn.

20     20. The Council resolution also recognized that "the "Occupy"
21 demonstrations are a rapidly growing movement with the shared goal of urging U.S.
22 citizens to peaceably assemble and occupy public space in order to create a shared
23 dialogue by which to address the problems and generate solutions for economically
24 distressed Americans[.]" After going through a litany of issues regarding economic
25 injustice, the Council "RESOLVED, with the concurrence of the Mayor, that by the
26 adoption of this Resolution, the City of Los Angeles hereby stands in SUPPORT for
27 the continuation of the peaceful and vibrant exercise in First Amendment Rights
28 carried out by "Occupy Los Angeles." Exhibit A.

21. A week later, the Council passed an amendment to the Resolution, having to do with the date on which the Council would consider a separate measure on "Responsible Banking." Exhibit A. Even as it amended the Resolution to address the "Responsible Banking" proposal, the Council reaffirmed its "support [for] the First Amendment Rights carried out by 'Occupy Los Angeles.'" Exhibit A, p.8.

22. There is no doubt that the Council was approving camping on the City Hall lawn as part of OLA's exercise of their First Amendment rights. The City Council was well aware of the manner in which plaintiffs and others with OLA were exercising their First Amendment rights at the time that the Resolution was passed. Moreover, the Resolution referenced similar "Occupy" expressive encampments around the country. Exhibit A, p.1. The Council recognized that "the 'Occupy' demonstrations are a rapidly growing movement with the shared goal of urging U.S. citizens to peaceably assemble and *occupy public space* in order to create a shared dialogue by which to address the problems and generate solutions for economically distressed Americans[.]" *Id.,* (emphasis supplied).

23. Pursuant to the City Administrative Code, the Mayor was required to act on the Resolution no later than October 24, 2011. On October 25, 2011, the Mayor's office returned the resolution to the City Clerk "without [the] Mayor's signature, with the understanding that this item will be considered deemed approved." Exhibit B, p.3. By operation of law, the Resolution took effect on October 25, 2011. *Id.,* p.1. *See also,* Los Angeles City Administrative Code Section 2.19(b)(iv).

**THE CITY CHARTER AND ADMINISTRATIVE CODES:**

24. Pursuant to the Los Angeles City Charter, the City Council is the legislative branch of municipal government. The Council is empowered to adopt ordinances, regulations and resolutions on behalf of the City.

**Sec. 240. Legislative Power.**

1. All legislative power of the City except as otherwise provided in the

7

Charter is vested in the Council and shall be exercised by ordinance, subject to the power of veto or approval by the Mayor as set forth in the Charter. *Other action of the Council may be by order or resolution*, not inconsistent with the duties and responsibilities set forth in the Charter or ordinance. Except as otherwise specifically provided in the Charter, the Council shall have full power to pass ordinances upon any subject of municipal concern. (Emphasis supplied).

24. Los Angeles Administrative Code Section 2.19 sets forth the process by which official City positions are established and may be amended. Once the Council adopts a resolution, the Mayor may not act, unilaterally, in contravention of the Council resolution. The only lawful means by which an official City position, as expressed by a resolution, may be amended or rescinded is through adoption of a subsequent resolution by the City Council that, through the normal legislative process with respect to resolutions, is then sent to the Mayor for his consideration. *See* Los Angeles Administrative Code Sections 2.19(b)(vi)-(vii). Even in urgent and exigent circumstances, which is not the case here, municipal law requires the Mayor to come to agreement first with the President of the City Council or the Chief Legislative Analyst acting on behalf of the Council President to establish an official City position, which then must be referred to the City Council for consideration in the form of a resolution. Administrative Code Section 2.19(d).

25. In this instance, the City code provisions were flagrantly ignored by the Mayor as he made his pronouncement that Occupy LA must end at 12:01 a.m. on November 28, 2011. While the Mayor has the authority to enforce ordinances under the City Charter and Administrative Code, that authority is necessarily constrained by the Council's express authority to adopt resolutions modifying or suspending City ordinances, rules and regulations. The Mayor could have vetoed

the resolution passed at the beginning of October to designate City Hall's south lawn as a location where OLA could remain in tents as part of the peaceable exercise of their First Amendment rights. He did not do so. Mayor Villaraigosa's pronouncement ending Occupy LA is an *ultra vires* act in excess of his mayoral authority under the City Charter and Administrative Code and, therefore, is null and void.

26. The constraint on any City official or employee taking official action in contravention of the Council's resolution applies, as well, to defendant Beck and the Los Angeles Police Department. Administrative Code §2.19(a). Unless and until the City Council votes to rescind the resolution initially passed on October 5 and passed as amended on October 12, OLA has a lawful right to remain on the south lawn of City Hall.

## INJUNCTIVE RELIEF

27. A genuine conflict has arisen and presently exists between the parties. The City, acting through the Mayor and Chief of Police, have publicly announced that plaintiffs must leave the south lawn of City and will not be permitted to utilize the south lawn of City Hall as an appropriate venue for plaintiffs to "occupy public space" as part of their communication. Plaintiffs maintain that the City Council has properly exercised its authority under City law and approved OLA's expressive activities with full knowledge that the tents were a central part of the message being communicated. The City Council has expressly affirmed that OLA's means of conveying its message by "occupying public space" is within the scope of the First Amendment

28. Unless adjudicated by this Court, plaintiffs will arbitrarily lose their right to continue their peaceful expressive activities in an area of public space that is a quintessential public forum, whether identified now as a public park or as some other type of quintessential public open space that has historically been used for expressive activity in the City of Los Angeles. Plaintiffs are entitled to an

order, defining the respective rights of the parties in this instance and a declaration that the City may not employ a standardless system for access to public fora for core expressive activity.

## FIRST CLAIM FOR RELIEF

### FIRST AND FOURTEENTH AMENDMENTS; 42 U.S.C. §1983
### CALIFORNIA CONSTITUTION, ARTICLE I, SEC. 2

29. Plaintiffs reallege and incorporate by reference each and every allegation set forth in paragraphs 1 through 28, hereof, inclusive.

30. Defendants' actions and threatened actions to eject Plaintiffs from the quintessential public forum of City Hall south lawn violates the First and Fourteenth Amendments and analogous provisions of the California Constitution.

30. The City has attempted to apply City ordinances post hoc to Occupy LA, posting temporary signs nearly two months after the peaceful assembly began, announcing the closure of the south lawn forum from 10:30 p.m. to 5:00 a.m. Such post hoc rules are not lawful time, place or manner regulations.

31. These targeted restrictions cannot be justified by a compelling government interest sufficient to overcome the restraints on constitutionally protected speech.

## SECOND CLAIM FOR RELIEF

### FIRST and FOURTEENTH AMENDMENTS; 42 U.S.C. §1983
### CALIFORNIA CONSTITUTION §§ 7, 13
### DUE PROCESS and EQUAL PROTECTION OF LAW

32. Plaintiffs reallege and incorporate by reference each and every allegation set forth in paragraphs 1 through 31, hereof, inclusive.

33. Defendants have acted in an arbitrary and capricious manner in the application of existing statutes, the enforcement of post hoc rules in a quintessential public forum and the improper revocation of the grant of permission to engage in

peaceful assembly on the south lawn of City Hall. The order to leave the south lawn is the result of an *ultra vires* act by the Mayor. Neither the Mayor nor the Chief of Police has the authority to act in contravention of a duly passed resolution of the City Council, affirming the First Amendment right of plaintiffs to engage in the peaceful exercise of First Amendment rights through the continued "occupation" of public space.

## REQUEST FOR RELIEF

Plaintiffs request relief as follows:

1. A declaration that the decision by defendant Villaraigosa is in contravention of a duly adopted resolution of the City Council and in excess of his jurisdiction under the City Charter and City Administrative Code;

2. A temporary restraining order and/or a preliminary and permanent injunction, enjoining Defendants, their officers, agents and employees, from revoking authorization for plaintiffs to remain in their peaceful assembly in the public forum of City Hall south lawn;

3. For costs of suit pursuant to 28 U.S.C. §1920 and 42 U.S.C. § 1988, as well as the analogous provisions of California law.

4. For attorneys' fees pursuant to 42 U.S.C. §1988 and California Code of Civil Procedure §1025.1.

5. For such other relief as this Court deems just and proper.

Dated: November 28, 2011                Respectfully submitted,

                                        By: ____Carol A. Sobel____
                                        Carol A. Sobel
                                        Attorneys for Plaintiffs